UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Edward Matthew Aydt,           Case No. 23-24094-beh

              Debtor.                Chapter 13

      Universal Credit Advisors, LLC,

              Plaintiff,

v.                            Adv. No. 23-02136-beh

      Edward Matthew Aydt,

              Defendant.

## DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is the latest chapter in a series of disputes stemming from debtor Edward Aydt's short-lived involvement in a business venture that ultimately was revealed to be a Ponzi scheme. The business, run by Albert Golant, purportedly engaged in the purchase, export, and resale of luxury vehicles. By virtue of Aydt's involvement, he incurred a significant debt to plaintiff Universal Credit Advisors, LLC ("UCA"), headed by Scott Lurie.

UCA alleges that Aydt's debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), as one for money "obtained by [] false pretenses, a false representation, or actual fraud," and under 11 U.S.C. § 523(a)(4), as one "for . . . larceny." Aydt has moved for summary judgment on both claims. For the reasons discussed below, Aydt's motion will be granted.

### JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## SUMMARY JUDGMENT RULES AND UNDISPUTED FACTS

Before identifying the relevant facts for present purposes, the Court provides an overview of the rules governing the procedures for filing and responding to motions for summary judgment.

Federal Rule of Civil Procedure 56(c)(1) requires a party moving for summary judgment (i.e., the party with the initial burden of demonstrating that a fact "cannot be . . . genuinely disputed") to support its factual positions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), or by showing that "[the] adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B). In response, the nonmoving party either must "show[] that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute," Fed. R. Civ. P. 56(c)(1)(B), or "cit[e] to particular parts of materials in the record" that demonstrate a factual dispute, Fed. R. Civ. P. 56(c)(1)(A). Unsupported allegations or denials are insufficient. *See, e.g., Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the [moving party], that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."). If the non-moving party fails to properly address a movant's assertion of fact, the Court may consider the fact undisputed. Fed. R. Civ. P. 56(e)(2).

Here, and in accordance with the civil rules, Mr. Aydt filed a summary judgment brief that includes a statement of 44 separate facts, supported by citations to materials in the record. *See* ECF No. 37, at 2–7. In its response brief, UCA does not dispute (or even address) Aydt's factual contentions. Instead, in conclusory fashion, UCA "objects to the outline of the proposed Findings of Fact provided by Defendant," and then "generally reiterates the . . . relevant background"—which consists of ten bullet-pointed statements, supported primarily by citations to limited excerpts of prior testimony given by Aydt and Lurie. *See* ECF No. 38, at 2–4.

In spite of—or perhaps due to—the deficiencies in UCA's response, the Court has considered other facts evident from the record when necessary to tell a coherent story. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). To the extent that UCA "fails to properly address [Aydt's] assertion[s] of fact" with citations to particular parts of materials in the record—and the record as a whole does not bear out UCA's denials or contrary assertions—the Court will consider Aydt's asserted facts undisputed for purposes of this motion. Fed. R. Civ. P. 56(e)(2).[1]

With that in mind, the facts set forth below are supported by the record in this case and, except where otherwise noted, are undisputed or not subject to genuine dispute.

From 2006 until 2016, debtor Edward Aydt was a car salesman at luxury car dealership Fields Auto Group. In the course of his employment, he became acquainted with Albert "Alex" Golant. In late 2016, Golant approached Aydt with a business proposal. Golant represented to Aydt that he owned a company called Wisconsin Automotive Trust, LLC,[2] which purchased and exported luxury vehicles for profit, and offered Aydt an opportunity to become involved with the business by finding investors willing to provide necessary capital to purchase the vehicles. *See* ECF No. 36-1 (Def. Ex. A), at 2–3 (6:16–7:11). In exchange, Aydt would receive a commission of one-third of the profit on all sales funded by such investors. *See id.* at 3 (7:12–25).

---

[1] More than once in this litigation, the parties have alluded to the Court's "familiarity" with the underlying facts of this case, due to its involvement in the debtor's prior bankruptcy case and adversary proceedings. *See, e.g., Layng v. Aydt (In re Aydt)*, Case No. 20-20738, Adv. No. 20-02103, 2022 WL 107334 (Bankr. E.D. Wis. Jan. 11, 2022). But the record in prior proceedings, unless made part of this record by docket entry with attachments, is not the record in this case. *See, e.g., Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978–79 (7th Cir. 2014) (deposition transcripts filed in a separate civil action are not made part of the record in a different case—and therefore cannot be considered on summary judgment—merely because they can be accessed easily using modern electronic dockets).

[2] The full entity name registered with the Wisconsin Department of Financial Institutions is WI Automotive T.R.U.S.T., Lease, Registration, and Consulting LLC.

Aydt accepted the invitation, and in turn approached Scott Lurie—whom he also had met through his employment at Fields—about investing in the endeavor. Lurie was the principal of a lending company doing business as F Street Investments LLC, which later was succeeded in interest by plaintiff Universal Credit Advisors, LLC.

As Lurie explained his understanding of Aydt's offer: "Mr. Aydt was involved with a gentleman, Mr. G[o]lant, and their partnership was a business which bought cars in the United States and exported them to China. . . . [T]he investment was to lend them the money to make the acquisition for the vehicle. Subsequently, when the vehicle . . . finally landed and payment was returned to them, they were paying us back and we were lending them money to do so." ECF No. 39 (Pl. Ex. C), at 28–29 (65:23–66:9); *see also id.* at 30 (67:8–23) (Lurie testifying that "[Aydt] said [he and Golant] had a many-year relationship in the automotive industry and have formed a partnership to which they were exporting these vehicles and he saw the opportunity and [] he was no longer with Fields Automotive and this was his new career.").

Aydt described the potential investment opportunity similarly to Lurie in a September 1, 2016, email:

> Here are the documents to provide you with financial background[.] Wisconsin Automotive Lease Trust is a group that I've been involved with from a business standpoint since 2010 and as a partner for the better part of the last year.

> In short, the business model consists of leveraging/exploiting world markets/demand for specifically identified luxury vehicles in a high volume quick-turn manner. None of the deals are speculative and each is secured by a substantial up-front. Basically, our present resources relative to present demand do not allow for maximized cash flow efficiency; therefore, affecting potential margins and volume.

*Id.* (Pl. Ex. B), at 7 (24:1–23).

Lurie opted to invest and, in the first week of September 2016, F Street loaned $500,000 to Wisconsin Automotive Trust. The money was sent via wire transfer to the company's account at MB Financial Bank, based on wiring

information and instructions Aydt provided to Lurie. *See id.* (Pl. Ex. C), at 33 (75:1–16); ECF No. 36-3 (Def. Ex. C), at 24–26. Although Lurie believed that Aydt was "managing" the wires, Aydt testified that he never had access to the MB Financial account or any of the F Street loan proceeds. *See* ECF No. 39 (Pl. Ex. C), at 36 (79:20–22); ECF No. 36-1 (Def. Ex. A), at 8 (13:1–15); *see also* ECF No. 36-3 (Def. Ex. C), at 5.

Throughout September and into October 2016, and at Lurie's request, Aydt provided F Street with documentation (purchase orders, proof of payment, cash flow summaries) purportedly related to transactions completed using F Street's loan proceeds. *See* ECF No. 39 (Pl. Ex. B), at 19–21 (101:2–16, 103:1–6, 105:4–21); *id.* (Pl. Ex. C), at 31 (72:15–22); *see also* ECF No. 36-3 (Def. Ex. C), at 44. Aydt described his role as "intermediary," explaining that he merely passed on information that Golant supplied him, and was not personally involved in any purchases or completing purchase orders. *See* ECF No. 39 (Pl. Ex. B), at 21 & 24 (105:9–23 & 140:2–141:15). Aydt also coordinated with Lurie and other F Street employees regarding the timing and amount of wire transfers between F Street and Wisconsin Automotive Trust. *See id.* at 22 (107:1–25); *id.* (Pl. Ex. C), at 33–36 (75:17–23 & 77:5–79:4).

All told, between September 2016 and January 2017, F Street invested between $3 million and $4.5 million into the project, executing at least four promissory notes with Aydt and Golant (which Aydt signed in his individual capacity, jointly and severally liable with Golant),[3] with a final January 1, 2017, note in the amount of $1.5 million.[4] Lurie's emails to Golant and Aydt

---

[3] Aydt testified that he agreed to be personally liable for such a large amount—even though he was not a member of Wisconsin Automotive Trust and never received any of the proceeds of the F Street loans—because he trusted and had been "groomed" by Golant. ECF No. 36-1 (Def. Ex. A), at 4 & 7–8 (8:1–7, 11:12–20 & 13:1–6); ECF No. 39 (Pl. Ex. B), at 13–17 (90:24–91:8 & 93:13–95:4).

[4] The record contains copies of an October 1, 2016, note for $1 million; a December 1, 2016, note for $1.5 million; and a January 1, 2017, note for $1.5 million. ECF No. 36-3 (Def. Ex. C), at 9–16. The record also contains references to a $500,000 note signed in September 2016, *see id.* at 29–30, as well as a November 1, 2016, note for $1,000,000, *see id.* at 5, but copies of such notes have not been produced.

show an increasing frustration about the delay in repaying that note. ECF No. 36-3 (Def. Ex. C), at 22–23. Only a few short months later, in May 2017, Golant's scheme was exposed, and F Street was still owed over $1.5 million on the January note. *See* ECF No. 39 (Pl. Ex. B), at 8 (27:1–11); *id.* (Pl. Ex. C), at 32 (74:6–8); ECF No. 36-1 (Def. Ex. A), at 6–9 (10:22–11:20 & 13:1–14:14); ECF No. 36-3 (Def. Ex. C), at 22–23.

F Street assigned or otherwise transferred its rights to collect on the note to UCA and, in 2018, UCA sued Aydt (and Golant) in state court for recovery of the outstanding debt, asserting theories of breach of contract, intentional misrepresentation, and theft. That same year, Golant was arrested and indicted, and subsequently pled guilty to wire fraud and conspiracy to commit tax fraud.

In January 2020, Aydt and his then-wife filed a joint bankruptcy petition, Case No. 20-20738-beh,[5] which stayed UCA's state court litigation. UCA objected to the discharge of its debt in Aydt's bankruptcy, *see* Adv. No. 20-02040-beh, asserting that the debt was not dischargeable under 11 U.S.C. §§ 523(a)(2) and/or (a)(4). Before UCA's adversary complaint could be resolved, the United States Trustee initiated his own adversary proceeding, Adv. No. 20-02103-beh, objecting to Aydt's discharge under 11 U.S.C. §§ 727(a)(3), (a)(5) and (a)(4)(A). The Court held UCA's adversary complaint in abeyance pending the outcome of the U.S. Trustee's lawsuit.

The latter proceeded to a two-day bench trial, at which both Aydt and Lurie testified. For reasons explained in greater detail, *see Layng v. Aydt (In re Aydt)*, Case No. 20-20738, Adv. No. 20-02103, 2022 WL 107334 (Bankr. E.D. Wis. Jan. 11, 2022), the Court found that the U.S. Trustee had failed to meet his burden under 11 U.S.C. §§ 727(a)(3) and (a)(5), but had done so for his claim under § 727(a)(4)(A) (false oaths). The Court denied Aydt's discharge under that provision, but clarified that its decision was "for reasons having

---

[5] The case initially was filed under Chapter 13 of the Bankruptcy Code, and later converted to a case under Chapter 7.

little to do with [Aydt's] association with fraudster Golant, and much more to do with his own inattention, inaccuracy, and delay." 2022 WL 107334, at *26. The denial of Aydt's discharge rendered UCA's adversary complaint moot.

After the conclusion of Aydt's Chapter 7 bankruptcy case, UCA resumed its state court litigation. On the eve of trial, in late 2022, the parties reached a settlement and stipulated to judgment against Aydt and in favor of UCA for $1,000,000.[6]

A year later, in September 2023, Aydt filed his current Chapter 13 bankruptcy case. UCA again objected to the dischargeability of its debt under 11 U.S.C. §§ 523(a)(2) and/or (a)(4). The case is now at the summary judgment stage, and Aydt has moved for judgment on UCA's two remaining causes of action, for false representations under 11 U.S.C. § 523(a)(2)(A), and larceny under 11 U.S.C. § 523(a)(4).[7]

Because UCA has failed to adduce evidence that would allow a reasonable fact-finder to conclude that Aydt acted with knowledge or fraudulent intent under section 523(a)(2)(A) or (a)(4), Aydt's motion will be granted.

## APPLICABLE LAW

### A. Summary Judgment Standard

The summary judgment standard is a familiar one. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to

---

[6] At times, Aydt appears to dispute UCA's standing to raise the claims at issue and questions UCA's assertions that F Street assigned it Aydt's note in May 2017. Regardless of the mechanism by which UCA obtained the ability to enforce the F Street note, UCA currently holds a state court judgment in settlement of conduct alleged in the complaint. UCA is entitled to enforce that debt, as well as seek a determination of whether that debt is dischargeable. *See, e.g., See FDIC v. Meyer (In re Meyer)*, 120 F.3d 66, 70 (7th Cir. 1997) (rejecting debtor's argument that lender's assignment of his loan payments to its parent bank barred the parent bank from pursuing a claim against the debtor under section 523(a)(2)).

[7] Aydt previously sought dismissal of UCA's complaint on several grounds, *see* ECF Nos. 6, 7 & 17. After UCA clarified that its complaint did not (nor did it attempt to) state a claim for false statements respecting the debtor's financial condition under 11 U.S.C. § 523(a)(2)(B), or a claim for "fraud or defalcation while acting in a fiduciary capacity" under § 523(a)(4), the Court granted Aydt's request in part. It dismissed UCA's claim for embezzlement under § 523(a)(4), leaving only its causes of action under § 523(a)(2)(A) and larceny under § 523(a)(4).

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be "material," a fact must be "outcome-determinative under governing law." *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

In determining whether there is a genuine issue of material fact, the Court must "construe all facts, and draw all reasonable inferences from those facts, in favor of the nonmoving party," and does not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 727 (7th Cir. 2020). As always, however, the Court draws "only reasonable inferences, not every conceivable one." *Spitz* v. *Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014); *see also MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) ("An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment."). In other words, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018) (internal quotation marks omitted). The nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the burden of establishing that summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party is the defendant, as here, he can meet that burden by either "(1) showing that there is an absence of evidence supporting an essential element of the [plaintiff's] claim; or (2) presenting affirmative evidence that negates an essential element of the [plaintiff's] claim." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1015–16 (7th Cir. 2016). Once the

defendant has done so, the plaintiff cannot rest merely upon the allegations in its complaint but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in [its] favor." *Marr v. Bank of America, N. A.*, 662 F.3d 963, 966 (7th Cir. 2011). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal citations omitted).

**B.  Section 523(a)(2)(A)**

Section 523(a)(2)(A) of the Code excepts from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The statute is phrased in the disjunctive, describing three separate grounds for nondischargeability: false pretenses, false representations, and actual fraud. Although these independent causes of action require proof of different elements, there is some overlap in the analysis of each: "the common thread is a debtor's intent to defraud a creditor." *Krizan v. Krizan (In re Krizan)*, Case No. 20-10233-7, Adv. No. 20-17, 2021 WL 3007911, at *4 (Bankr. W.D. Wis. July 15, 2021).

**1.  False Pretenses and False Representation**

To except a debt from discharge based on false pretenses or a false representation, the creditor must establish the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010); *see also Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011). A creditor must establish all three elements to support a finding of false pretenses or false representation; failure

to establish any one element is outcome determinative. *Chop Foo, LLC v. Fara (In re Fara)*, 663 B.R. 696, 718 (Bankr. N.D. Ill. 2024).

A "false representation" is an express misrepresentation or omission, which can be spoken, written, or demonstrated through conduct, while "false pretenses" include implied misrepresentations or conduct intended to create or foster a false impression. *CQM, Inc. v. VandenBush (In re VandenBush)*, 614 B.R. 306, 315 (Bankr. E.D. Wis. 2020) (citing *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 663 (Bankr. E.D. Wis. 2016) (a debtor's silence regarding a material fact or a failure to disclose pertinent information may be a false representation); *Title Guar. Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 246 (Bankr. N.D. Ill. 2014) (False pretenses may arise "when a debtor, with the intent to mislead a creditor, engages in 'a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or . . . understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor.'") (internal quotation marks omitted)); *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010), *aff'd,* 470 B.R. 808 (N.D. Ill. 2012) (a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence"); *Schouten v. Jakubiak (In re Jakubiak)*, Case No. 15-21424-GMH, Adv. No. 16-02141-GMH, 2019 WL 1453067, at *7 (Bankr. E.D. Wis. Mar. 29, 2019) (if a debtor borrows money from a creditor "while engaged in an ongoing effort to fleece him," that could amount to a debt for money obtained by false pretenses, while a debtor's misrepresentation about his intent to repay the loan or his deliberate concealment that he should not have been borrowing money from clients could establish a claim for false representation or actual fraud).

"Generally, the false representation must relate to present or pre-existing facts and cannot be merely unfulfilled promises or statements of future events." *Holzhueter v. Growth (In re Holzhueter)*, 575 B.R. 444, 454–55 (Bankr. W.D. Wis. 2017); *Kyle-Wolf v. McClure (In re McClure)*, 625 B.R. 733, 740

(Bankr. C.D. Ill. 2021) ("Ordinarily, to be actionable under § 523(a)(2)(A), a false representation must concern a present or past fact."). A promise to perform an act in the future is actionable only if the debtor made the representation with no intention of ever keeping the promise. *McClure*, 625 B.R.at 740; *Levine v. Ward (In re Ward)*, 425 B.R. 507, 516–17 (Bankr. E.D. Wis. 2010) (quoting *Mega Marts, Inc. v. Trevisan (In re Trevisan),* 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003) ("Proof of intent for purposes of § 523(a)(2)(A) must be measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services. . . . Therefore, subsequent acts of fraud or omission do not establish that the debtor had the requisite intent at the time the representations were made.").

Both false pretenses and false representations require a creditor to prove justifiable reliance. This is a less demanding standard than "reasonable reliance." *In re Zaidel*, 553 B.R. at 666 (citing *Field v. Mans,* 516 U.S. 59, 70–73 (1995)). It requires a subjective inquiry into the characteristics of the particular plaintiff and the circumstances of the case. *Tillman Enterprises, LLC, v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 840 (Bankr. N.D. Ill. 2018), *aff'd*, 653 B.R. 410 (N.D. Ill. 2023). While the justifiable reliance standard does not impose an affirmative duty on the creditor to investigate, a creditor may not "blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71. Justifiable reliance is a mixed question of law and fact. *Ojeda*, 599 F.3d at 716.

The Seventh Circuit and many lower courts under its jurisdiction have added a fourth requirement to prove a claim of false pretenses or false representation (either expressly, as a separate element of proof, or implicitly, as a component of the "reliance" inquiry): that the representation was the proximate cause of the creditor's loss. *See, e.g, In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Wan Ho Indus. Co., Ltd. v. Hemken*

(*In re Hemken*), 513 B.R. 344, 353 (Bankr. E.D. Wis. 2014). (identifying four elements for a § 523(a)(2)(A) claim, with the last element being that the creditor's reliance "was the proximate cause of the loss."); *McClure*, 625 B.R. at 740 ("Once [the first three] elements are established, the creditor must then prove a loss proximately caused by her justifiable reliance."); *Fara*, 663 B.R. at 718 (citing *Rae v. Scarpello* (*In re Scarpello*), 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) ("To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge.")).

### 2. Actual fraud

In contrast to false pretenses and false representations, "actual fraud" is not limited to instances of fraudulent inducement, nor does it require a misrepresentation or reliance. *McClellan v. Cantrell*, 217 F.3d 890, 893–94 (7th Cir. 2000). To prevail on a claim for actual fraud under section 523(a)(2)(A), a creditor must establish that "(1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute." *In re Fara*, 663 B.R. at 720.

This dischargeability exception does not extend to constructive frauds, only actual ones, meaning that the creditor must show the debtor perpetrated a "positive fraud"—i.e., one "involving moral turpitude." *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360–61 (2016) (Actual fraud "denotes any fraud that involv[es] moral turpitude or intentional wrong, [and] stands in contrast to implied fraud or fraud in law"; actual fraud encompasses fraudulent conveyance schemes, which "are not an inducement-based fraud.") (internal citations and quotation marks omitted);*Trevisan*, 300 B.R. at 718 ("Fraud, in the context of § 523(a)(2)(A), means 'positive fraud involving moral turpitude.'"); *McClellan*, 217 F.3d at 893 ("[F]raud . . . includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.") (quoting *Stapleton v. Holt*, 250 P.2d 451, 453–54 (Okla. 1952)).

**C.      Section 523(a)(4)**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). UCA advances a claim under the third theory of liability: larceny.

For purposes of section 523(a)(4), larceny is "the 'fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner.'" *Hebl v. Windeshausen (In re Windeshausen)*, 568 B.R. 299, 307 (Bankr. W.D. Wis. 2017), *aff'd sub nom. Hebl v. Windeshausen*, 590 B.R. 871 (W.D. Wis. 2018); *see also Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991) ("Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner.")*; Fara*, 663 B.R. at 723 ("Larceny requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent.") (internal quotation marks omitted). "The intent required for larceny is specific" and "requires more than proving general deceit." *Fara*, 663 B.R. at 723.

**DISCUSSION**

**A.      Section 523(a)(2)(A)**

Although UCA frequently alludes to Aydt's "misrepresentations," it is unclear from its amended complaint and briefing whether UCA intends to proceed exclusively under a theory of false representation and/or false pretenses, or also attempts to assert a theory of actual fraud. The Court will address each theory of fraud under section 523(a)(2)(A), first considering false pretense and false representation together, then actual fraud.

**1.      False Pretenses and False Representation**

In its complaint, UCA ostensibly identifies several allegedly false statements Aydt made about Wisconsin Automotive Trust (d/b/a Timeless Auto Group), concerning, among other things: (a) the legitimacy, legality and

reputation of the business and its owners; (b) the business's relationship with well-established and trustworthy automobile dealerships and its prior financing arrangements with reputable banks and lenders; and (c) the business's need for funding, use of loan proceeds, and documentation of such use. *See* ECF No. 24, at 4–5, ¶¶ 15–22.

None of these alleged statements by Aydt, however, are reproduced in UCA's summary judgment brief as "relevant background" facts. *See* ECF No. 38, at 2–3. Instead, the only express representation UCA describes is that "Aydt represented himself as a partner in [Golant's business] to Lurie." *See id.* at 2. UCA nevertheless goes on to argue that genuine issues of material fact exist— and therefore summary judgment is unwarranted—regarding several other vaguely identified statements, some of which appear to be suggested in its complaint.

First, UCA refers to representations about the existence of Wisconsin Automotive Trust. *See* ECF No. 38, at 9–10. This includes unidentified "misrepresentations about the amount of time [the business] had been operating," and similarly unidentified representations about "the nature and duration of the business entity involved." The most specificity UCA offers here is that Aydt told UCA "that he was involved in a new business venture, separate and apart from their prior business relationship, while also representing that the business had been around and already doing the type of transactions it claimed to be doing for some time." *Id.* at 9. UCA does not cite any corresponding evidence for this statement, and the only plausible support in the record is the September 1, 2016, email described *supra*, in which Aydt tells Lurie that he's been "involved" with Wisconsin Automotive Trust since 2010 and "as a partner" for the better part of 2016. Even assuming such a statement were actionable, UCA does not explain or establish how the statement is false.

UCA next alludes to "misrepresentations made prior to [Aydt] obtaining money." ECF No. 38, at 10. Again, UCA does not identify any specific

statements, but implies that such statements do not include "representations to unrelated third parties" and those "relating to documentation after the funds were obtained." *Id.* Otherwise, UCA simply says: "[A]s shown throughout this briefing, there exist multiple issues of material fact relating to what representations were made, when they were made, [and] whether they were made with the intent to deceive . . . ." *Id.* at 11.

Indeed, what representations *were* made? At this stage, UCA is required to put forth evidence (by citing to "particular parts of materials in the record," Fed R. Civ. P. 56(a)(1)) to establish each element essential to its claim—not to ask the Court to deduce what UCA might mean. As the Seventh Circuit often reminds colorfully,"'[j]udges are not like pigs, hunting for truffles buried in' the record." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) (quoting *Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002)); *see also Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004) ("A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."); *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998) (a court considering a motion for summary judgment is not required to "assume the truth of a nonmovant's conclusory allegations on faith," nor "scour the record to unearth material factual disputes"); *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 808 (7th Cir. 2017) ("A party opposing summary judgment does not meet [the rules'] obligation by simply dropping a stack of paper into the court file (literally or electronically) and asserting that someone who reads the stack will find a genuine issue of material fact.") (citing Fed. R. Civ. P. 56(c)(1) & (c)(3)).

Finally, UCA alleges that Aydt made representations about the intended use of the funds. *See* ECF No. 38, at 12–13. UCA identifies no specific representations, but instead cites to evidence concerning Lurie's own beliefs and intentions about the loan proceeds. UCA then proclaims: "The parties have also testified about the importance of Aydt providing Plaintiff with timely and

proper documentation showing the use of the funds, which is clear evidence of the existence of a representation that the funds would be used only for relevant business purposes." Clear evidence? Not so. The material UCA cites in support establishes, at most, that Aydt knew that record-keeping was important to Lurie, and that Aydt emailed Lurie with proof of purchases and requests for funding to purchase additional vehicles. This proves neither an express nor an implied representation (nor, for purposes of false pretenses, a course of conduct intended to foster a false impression). Even if it did, UCA has failed to offer any evidence that the funds were not, in fact, used to purchase vehicles or for other relevant business purposes. [8]

### 2. Actual Fraud

With no evidence of any express or implied misrepresentations in the record, UCA is left with only a potential "actual fraud" claim. UCA appears to raise such a theory in arguing that genuine issues of material fact remain as to Aydt's knowledge of the scheme and his intent to deceive F Street—in other words, whether Aydt was an innocent victim, or a willing participant, in Golant's scam. *See* ECF No. 38, at 11–12.

Before evaluating the sufficiency of UCA's evidence on this point, the Court will address the sufficiency of its legal arguments regarding questions of intent and credibility. According to UCA, because intent is a question of fact, the Court cannot (or at least should not) decide on summary judgment whether Aydt acted with intent to deceive. *See* ECF No. 38, at 8.

---

[8] Aydt argues alternately that summary judgment is warranted even assuming he made the allegedly false statements at issue, because UCA has not proven that (1) it justifiably relied on the statements; (2) the statements were material; and (3) the statements caused UCA to enter into the January 2017 note. *See* ECF No. 37, at 12–4. Because UCA has failed to establish the existence of a misrepresentation, it is unnecessary to address these contentions. *Celotex,* 477 U.S. at 322–23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Admittedly, the Seventh Circuit has instructed that "summary judgment ought to be used sparingly and with great caution in cases . . . where subjective intent is a factor in the determination." *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993); *see also Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989) ("[W]here the defendant's motive or state of mind is an essential element of a plaintiff's case, a court must be circumspect in granting summary judgment based solely on the defendant's categorical denial that the requisite mental state existed."). But, as with all general rules, there are exceptions: even in cases involving subjective intent, "summary judgment is not inappropriate where the undisputed facts make the outcome clear*." Alexander*, 982 F.2d at 1160 (affirming summary judgment where the evidence was not sufficient to permit a jury to conclude that the defendant possessed the subjective intent to defraud); *see also Corrugated Paper*, 868 F.2d at 914 ("It is well-settled that summary judgment may be granted where the controlling issue is whether or not the movant acted with a particular mental state . . . if the burden is on the nonmovant to establish the state of mind and the nonmovant has failed to come forward with even circumstantial evidence from which a jury could reasonably infer the relevant state of mind.").

In other words, UCA's allegations of fraudulent intent "do not automatically save its claim from disposition on summary judgment. If that were the case, no debtor/defendant would ever prevail on a motion for summary judgment in a case where intent is an essential element." *Zelda Development, LLC v. Landon (In re Landon*), Case No. 18-11292, Adv. No. 19-01002, 2020 WL 1584484, at *8 (Bankr. S.D. Ga. Mar. 31, 2020) (granting summary judgment to debtors due to lack of evidence from which the court could infer intent to deceive, and citing examples of cases "where courts grant debtor/defendants' motions for summary judgment in dischargeability cases where fraudulent intent is an essential element").

UCA's "credibility" argument—that a trial is necessary to evaluate Aydt's trustworthiness—fares no better. *See, e.g.*, ECF No. 38, at 1–2 ("Mr. Aydt's self-serving testimony . . . that he didn't know what was going on and didn't intend to defraud Plaintiff out of money [] is certainly not enough to avoid going to trial in this matter . . .  especially with the need for weighing credibility in such circumstances . . . ."); *id.* at 8 ("Defendant providing unsupported and self-serving statements in contradiction to the *allegations* in this adversary proceeding does not equate to an award of summary judgment, especially when all inferences should be drawn in favor of the non-moving party.") (emphasis added).

It Is well-established that a plaintiff cannot avoid summary judgment "merely [by] recit[ing] the incantation, 'Credibility,'" or by calling the defendant a liar. *Corrugated Paper*, 868 F.2d at 914 ("[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.") (internal quotation marks omitted); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (a nonmovant "cannot avoid summary judgment merely by asserting that [the movant's witnesses] are lying"); *Stryjewski v. Javalera (In re Javalera)*, 642 B.R. 451, 458 (Bankr. N.D. Ill. 2022) ("[A] plaintiff cannot prevail at trial by asserting merely that the defendant's contrary testimony should not be believed.").

Instead, UCA must produce *specific facts* that cast doubt upon Aydt's version of events or his testimony on any material issue. *Rand*, 42 F.3d at 1146. Specific facts—i.e., those supported with admissible evidence—are required to create a *reasonable* or *justifiable* inference that a witness's testimony is not credible; "[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors." *Id.; see also Moran v. Calumet City*, 54 F.4th 483, 495 (7th Cir. 2022) ("We doubt that calling a defendant untruthful without any other evidence can satisfy a plaintiff's burden at summary judgment."); *Corrugated Paper*, 868 F.2d at 914 ("[T]he nonmovant ordinarily must identify specific factual inconsistencies in

the witness' testimony in order to withstand a motion for summary judgment."); *Lavine v. Shapiro,* 257 F.2d 14, 19 (7th Cir. 1958) (mere "anemic hope" that information contradicting deposition testimony will be elicited under cross-examination at trial is insufficient to withstand a motion for summary judgment).

In an attempt to satisfy its evidentiary burden, UCA asserts that it has produced three categories of circumstantial evidence from which the Court could reasonably infer that Aydt acted with knowledge and intent to deceive when requesting and obtaining funds from UCA.

First, UCA points to Aydt's business relationship with Golant, claiming that "Aydt was a partner with Golant in the business venture and associated with the enterprise for many years prior to reaching out to Plaintiff." ECF No. 38, at 11. But to the extent UCA's contention is that Aydt and Golant were partners in a legal sense, this assertion is neither legally nor factually supported.[9]

---

[9] Wisconsin law defines a partnership as: "an association of 2 or more persons . . . to carry on as co-owners a business for profit . . . ." Wis. Stat. § 178.0102(11). And Wisconsin case law identifies four elements contracting parties must satisfy to create a partnership: "The parties must (1) intend to form a bona fide partnership and accept the accompanying legal requirements and duties, (2) have a community of interest in the capital employed, (3) have an equal voice in the partnership's management, and (4) share and distribute profits and losses." *In re McCarthy,* 554 B.R. 866, 868 (Bankr. W.D. Wis. 2016) (quoting *Tralmer Sales & Serv., Inc. v. Erickson,* 186 Wis. 2d 549, 563 (Wis. Ct. App. 1994), in turn citing *Skaar v. Wisconsin Dep't of Revenue,* 61 Wis. 2d 93, 98–99 (1973)). "The ultimate and controlling test as to the existence of a partnership is the parties' intention of carrying on a definite business as co-owners," which "may be determined from the terms of the parties' agreement or from their conduct under the circumstances of the case." *Heck & Paetow Claim Serv., Inc. v. Heck,* 93 Wis. 2d 349, 360 (1980). That Aydt and Golant may have referred to one another as "partners" in the conversational sense does not make them partners under the law. *Compare System Dev. Integration, LLC v. Computer Sciences Corp.,* 739 F. Supp. 2d 1063, 1085 (N.D. Ill. 2010), *amended in part sub nom. System Dvmt Integration v. Computer Sciences Corp.,* No. 09 C 4008, 2011 WL 1311903 (N.D. Ill. Apr. 1, 2011) (that two parties referred to one another as "partners" in the colloquial sense was insufficient to establish a partnership under Illinois law). There is no evidence in the record that Aydt shared in the profits and losses of Wisconsin Automotive Trust. Commission-based payments like the kind Aydt testified he received are not enough to demonstrate a sharing of profits. Nor has UCA offered evidence to rebut Aydt's testimony that he did not have an ownership interest, access to, or control over the business's bank account at MB Financial; that he was not involved in the purchase of vehicles or completion of purchase orders; and that he did not share equally in the control and management of Wisconsin Automotive Trust.

At best, UCA's evidence on this point establishes that Aydt and Golant collaborated together on a short-lived and discrete business endeavor—one in which Aydt's role was to serve as a liaison between Wisconsin Automotive Trust and F Street and to provide Lurie with information and documents that Aydt received from Golant. Is this evidence circumstantial? Yes. Probative? No. The Court cannot reasonably infer from this record that Aydt acted with knowledge of Golant's scheme or an intent to defraud F Street. "Perhaps he was in on a scheme. Or perhaps he was sloppy, negligent, rushed, overworked, incompetent, naïve, or gullible. . . . There is no evidence that would allow a rational trier of fact to choose among these and other competing possibilities. . . . To lean one way or another is purely conjectural." *Fed. Deposit Ins. Corp. for NetBank, FSB v. First Am. Title Ins. Co.*, No. 1:10-CV-3032-WSD, 2012 WL 13005309, at *13–14 (N.D. Ga. Mar. 15, 2012) (granting summary judgment in favor of defendant when plaintiff failed to present non-speculative evidence of an intent to deceive).

Second, UCA relies on the fact that Aydt signed the promissory notes in his individual capacity. To infer an intent to deceive from this evidence is likewise wildly speculative. UCA's own briefing underscores this point (and simultaneously misapprehends UCA's evidentiary burden on summary judgment), asking rhetorically: "What individual would execute a note for more than a million dollars without knowing where that money was going or what it was being used for? That is simply illogical and those inferences should be drawn in Plaintiff's favor on this motion." ECF No. 38, at 11. UCA is entitled to only *reasonable* inferences in its favor. A plaintiff cannot defeat summary judgment by pointing to an array of possibilities and unanswered questions about a dispositive issue: "[A]n unanswered question does not amount to a genuine issue of material fact where the question remains unanswered due to insufficient evidence." *Leal v. TSA Stores, Inc.*, No. 2:13 CV 318, 2018 WL 1744959, at *5 (N.D. Ind. Apr. 10, 2018). The Court could posit a number of explanations why Aydt might have signed the notes in his individual capacity,

without an intent to deceive—Aydt himself testified that he did so based on his (misplaced) trust in Golant. That an individual exposes himself to personal liability, even for a sum as large as the amount at issue here, does not make it more likely that he is acting with a nefarious, rather than an honest, motive. To make such a determination on this record would amount to pure conjecture.

Finally, UCA asserts that "Aydt also had access to documentation and information about the use of those funds to provide to Plaintiff, hinting that Aydt knew much more about what was going on than he contends during this adversary proceeding." ECF No. 38, at 11–12. Unsubstantiated allegations and "hints" cannot substitute for the specific facts required to call into question Aydt's unrebutted testimony that he lacked knowledge of Golant's fraud or an intent to defraud F Street. Aydt's access to documents and information alone does not allow the Court to make the leap UCA urges.

Whether the Court considers each piece of UCA's circumstantial evidence alone, or examines everything together as a whole, the conclusion is the same. UCA argues that Aydt acted with an intent to deceive based on only a series of tenuous inferences—that Aydt received and controlled F Street's loan proceeds, that Aydt knew Golant was not using the proceeds to purchase vehicles as represented, and that Aydt had some plausible (but unidentified) motive for engaging in the deception. But it is equally likely that Aydt was a victim and unknowing participant in Golant's fraud. UCA's proffered facts and related suppositions are simply "too thin a reed" to support a legitimate inference that Aydt acted with the requisite knowledge and intent.

Because UCA has failed to meet its evidentiary burden of showing a genuine dispute of fact as to Aydt's knowledge and intent, summary judgment on UCA's claims under 11 U.S.C. § 523(a)(2)(A) in Aydt's favor is warranted.

## B.   Section 523(a)(2)(B)

Although UCA has denied articulating a claim under 11 U.S.C. § 523(a)(2)(B), *see supra* n.7, its summary judgment briefing muddies the

waters. The Court therefore will discuss this Code section briefly vis-à-vis UCA's complaint and its arguments on summary judgment.

In its complaint, UCA alleges that Aydt made several representations intended to project both Golant's and his own apparent affluence, including that "Golant had a large personal net worth 'in the tens of millions of dollars'"; that Aydt "himself had a large personal net worth"; and that Aydt "lived in a large, expensive home and [] owned numerous luxury cars." *See* ECF No. 24, at 5, ¶ 22.

Both at the dismissal stage, and now at summary judgment, Aydt argues that these statements cannot state a claim for dischargeability under section 523(a)(2) as a matter of law. Section 523(a)(2)(A) is inapplicable, says Aydt, because it encompasses only statements "other than [those] respecting the debtor's . . . financial condition," and thus excludes Aydt's statements concerning his own personal net worth. And section 523(a)(2)(B) likewise does not apply, because, although it covers statements about a debtor's financial condition, such statements must be "in writing." 11 U.S.C. § 523(a)(2)(B).

Aydt is correct. "Together, [sections 523(a)(2)(A) and (B)] leave a gap: debts for money obtained by a false *oral* statement about a debtor's *financial condition* are discharged."*Weltman v. Hakalir (In re Hakalir)*, Case No. 19 B 5093, Adv. No. 19 A 817, 2021 WL 3164786, at *5 (Bankr. N.D. Ill. July 26, 2021); s*ee also Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 720 (2018) ("[A] statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not."); *Coltefinanciera, S.A. v. Hane (In re Hane)*, Case No. 16-25954-LMI, Adv. Pro. No. 17-01234-LMI, 2018 WL 6841354, at *4 (Bankr. S.D. Fla. Dec. 28, 2018) (plaintiff's allegations that defendant "created an image of a successful multinational company" and attempted to project wealth and prosperity by

flaunting his membership at a private island beach club, where he showed off expensive sports cars and yachts, and telling plaintiff's shareholder that his weight loss and nutritional supplement business was "very successful," were representations respecting the debtor's financial condition, and therefore not actionable under section 523(a)(2)(A)) (citing *Barrett Bros., LLC v. Hedman (In re Hedman),* Case No. 17-11035-R, Adv. No. 17-01036-R, 2018 WL 3241065, at *10–12 (Bankr. N.D. Okla. July 2, 2018) (debtor's oral statement that his business was a "goldmine" was a statement respecting his financial condition and could not form the basis for non-dischargeability under section 523(a)(2)(A) or (B))).

Because the alleged statements about Aydt's personal net worth are respecting his financial condition, they are not actionable under section 523(a)(2)(A), and, because they are not in writing, they are not actionable under section 523(a)(2)(B).[10] Aydt therefore is entitled to summary judgment in his favor on such claims.

## C.     Section 523(a)(4)

This leaves UCA's larceny claim under section 523(a)(4). Aydt contends that summary judgment is warranted here for several reasons, and renews an argument he made at the dismissal stage: that funds voluntarily provided cannot be "stolen." *See, e.g.*, *Sega Auto Sales, Inc. v. Flores, (In re Flores)*, 524 B.R. 420, 430-31 (Bankr. D. Mass. 2015) (a debtor's obligation to a creditor for an unrepaid loan could not be excepted from discharge as a debt for the debtor's "larceny," regardless of whether the debtor had any intent to repay the creditor at the time he obtained the loan, given that the creditor willingly loaned the debtor $15,000, and the debtor did not wrongfully take any property of the creditor); *Groom v. Krook (In re Krook)*, 615 B.R. 479, 486 (Bankr. N.D. Ill.

_____

[10] UCA apparently fails to appreciate this distinction, responding only that "silence, concealment, and failure to disclose pertinent information are all considered false representations under 11 USC § 523(a)(2)(A)." ECF No. 38, at 8. A flawed legal theory is not UCA's only problem, however; UCA falls far short of meeting its evidentiary burden on summary judgment, neglecting to offer any proof that Aydt made representations about either his or Golant's purported affluence.

2020) (a creditor's allegations that he gave the debtor money in the belief that the debtor was acting as a broker for the seller of a classic car, while in fact the debtor had never contacted the seller nor intended to buy/deliver the car to the creditor and instead absconded with the money, could not state a claim for larceny because the debtor "gained possession of [the creditor's] money lawfully, in the sense that [the creditor] willingly put the money in [the debtor's] hands"—but the creditor *could* state a claim for embezzlement in that he entrusted the funds to the debtor to transmit to the seller).

To counter this argument and credibly contend that the funds were provided "without the consent of the owner" or otherwise unlawfully for purposes of larceny, UCA must establish, at a minimum, that Aydt obtained the loan(s) with fraudulent intent. *See, e.g., FDIC v. Roberti (In re Roberti)*, 201 B.R. 614, 629 (Bankr. D. Conn. 1996) (the debtor's obligation for a bank loan induced by falsely representing that the bank was lending money to an existing corporation was nondischargeable under section 523(a)(4) as a debt for larceny; the debtor's fraudulent acquisition of the loan meant that the bank did not "consent" to the line of credit); *Savings Bank v. Barrick (In re Barrick)*, 518 B.R. 453, 461–62 (Bankr. N.D. Ill. 2014) (considering whether the debtor "possessed the requisite felonious intent at the time he applied for the Loan" in determining whether the debt was one for larceny); *Nasif v. Palladino (In re Palladino)*, 560 B.R. 608, 628–29 (Bankr. D. Mass. 2016) (judgment debt arising out of funds that the Chapter 7 debtor obtained from investors in a Ponzi scheme would be excepted from discharge as one for money obtained by the debtor's larceny; the debtor's admission, by pleading guilty to a criminal charge of larceny and admitting to facts constituting larceny by theft, established that he was a knowing participant in the Ponzi scheme and had solicited funds from investors with the requisite fraudulent intent to convert the funds). For the reasons already explained, UCA has not done so.[11]

---

[11] It is therefore unnecessary to address the debtor's alternate argument that one cannot steal funds he never controlled or possessed.

Because UCA failed to carry its burden to demonstrate a genuine dispute of fact as to whether Aydt wrongfully and fraudulently took any property from UCA, the Court will grant summary judgment on its § 523(a)(4) larceny claim.

## CONCLUSION

As noted throughout this decision, the nonmovant UCA has failed to meet the summary judgment standards to counter movant Aydt's factual support undergirding his request for judgment on all claims. There is no genuine dispute of material fact for trial. Accordingly, summary judgment in Aydt's favor is warranted.

The Court will enter a separate order consistent with this decision.


Dated: January 24, 2025

By the Court:

Beth E. Hanan
United States Bankruptcy Judge